Mark R. Pachowicz (SBN 138108)
*mark@pglaw.law*
Jennie Hendrickson (SBN 144562)
*jennie@pglaw.law*
**PACHOWICZ | GOLDENRING APLC**
6050 Seahawk Street
Ventura, CA 93003-6622
Tel: (805) 642-6702 / Fax: (805) 805-642-3145

Attorneys for Plaintiff, Ignacio Ixta, Jr.

Sonia Mercado (SBN 117069)
*soniamer2002@yahoo.com*
**SONIA MERCADO & ASSOCIATES**
5711 W Slauson Ave Ste 100
Culver City, CA 90230-3421
Tel: (310) 410-2981

Attorney for Plaintiff P.I.I., a minor by and through his guardian ad litem,
Ginger Martinez

Jonny Russell (SBN 297468)
*Jonnyrussell.law@outlook.com*
**LAW OFFICES OF JONNY RUSSELL**
10918 SW Celeste Ln. #202
Portland, OR 97225
Tel: (805) 302-1805

Attorney for Plaintiff A.I., a minor, by and through his guardian ad litem,
Wendy Galvan

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| IGNACIO IXTA, JR., individually; A.I., a minor, by and through his guardian ad litem, Wendy Galvan; P.I.I., a minor by and through his guardian ad litem, Ginger Martinez<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF VENTURA, a public | CASE NO.<br>ASSIGNED TO HON.<br><br>**COMPLAINT FOR DAMAGES and DEMAND FOR JURY TRIAL:**<br><br>1. Deprivation of Due Process of Law and Violation of Right to a Fair Trial Under the Fourteenth |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

entity; VENTURA COUNTY OFFICE OF THE DISTRICT ATTORNEY, a public entity; CITY OF OXNARD, a public entity; OXNARD POLICE DEPARTMENT, a public entity; EDWARD BALDWIN; individually and in his official capacity as a peace officer; ALEX ARNETT, individually and in his official capacity as a peace officer; CHRIS WILLIAMS, individually and in his official capacity as a peace officer; JOHN CROMBACH, individually and in his capacity as former Chief of Police of the City of Oxnard; and DOES 1 through 10, inclusive.

Defendants.

Amendment (42 U.S.C. §1983);

2. Failure to Disclose Material Exculpatory Evidence (Brady, Garcia, and Moody) (42 U.S.C. § 1983);

3. Deprivation of Due Process of Law re Impermissibly Suggestive Identification Procedures (*Simmons v. United States*) (42 U.S.C. § 1983);

4. Deprivation of Due Process of Law re Fabricated Evidence (*Devereaux v. Abbey*) (42 U.S.C. § 1983);

5. Illegal Detention and Prosecution (42 U.S.C. § 1983);

6. Violations of Policy, Custom & Practice *(Monell)* (42 U.S.C. section 1983);

7. Supervisor Liability (42 U.S.C. § 1983);

8. Loss of Familial Association in Violation of First and Fourteenth Amendment (42 U.S.C. § 1983);

9. Violation of Bane Act (*Cal. Civ. Code* § 52.1);

10. Negligence;

11. False Arrest/False Imprisonment;

12. Intentional Infliction of Emotional Distress

## **COMPLAINT FOR DAMAGES**

Plaintiff, IGNACIO IXTA, JR., by and through his attorneys, Pachowicz

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

| Goldenring, APLC; and A.I, by and through his attorney Law Offices of Jonny Russell, and guardian ad litem, Wendy Galvan; and P.I.I., by and through his attorneys Sonia Mercado & Associates, and guardian ad litem, Ginger Martinez, respectively, bring their Complaint for Damages and Demand for Jury Trial and allege against Defendants, and each of them, as follows:

## **INTRODUCTION**

1.     This is a civil rights action regarding the deprivation of rights due to The wrongful arrest, detention, prosecution and incarceration of Ignacio Ixta, Jr. (hereinafter referred to as "Mr. Ixta Jr.") for a crime he did not commit, which defendants knew or should have known he did not commit.

2.     Plaintiffs bring this action seeking recovery for the harms and losses Mr. Ixta, Jr. has suffered at the hands of the defendants, and to prevent future incidents of wrongful incarceration.  Further the minor plaintiffs bring their own claims for deprivation of the familial relationship, for their own harms and losses caused by defendants and each of them. By bringing this action, Plaintiffs also seek to end the unlawful policies and practices of the Oxnard Police Department (and its management) as well as the County of Ventura, and its District Attorney's Office; so that no other individuals will have to suffer the same severe harms and losses Plaintiffs have suffered.

3.     This case involves important rights affecting the public interest.

## **JURISDICTION AND VENUE**

4.     This action is brought for redress of alleged deprivations of constitutional rights protected by 42 U.S.C. §§ 1983 and 1988, the First and Fourteenth Amendments to the United States Constitution.   Federal question

jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a) (3) and (4), and the aforementioned statutory and constitutional provisions.  Plaintiffs further invoke the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under state law.

5.     Plaintiffs timely and properly filed tort claims as against the government entities and above-named defendants pursuant to Cal. Gov. Code § 910 et seq., on October 4, 2021. The claims were rejected by the City of Oxnard, after the 45-day time limit for rejection had passed, on December 2, 2021. No rejection was received by the County of Ventura. This action is timely filed within all State and Federal applicable statutes of limitations.

6.     The acts complained of herein arose in the Central District of California, County of Ventura. Venue properly lies in this district pursuant to 28 U.S.C. section 1391, and is also proper under § 1391(b)(1) in that one or more defendants resides or have their principal place of business in the Central District.

### PARTIES

**PLAINTIFFS**

7.     Plaintiff Ignacio Ixta, Jr. was, at all times relevant herein, a resident of the County of Ventura, State of California, except for all times when he was wrongfully incarcerated—including in the maximum-security Pelican Bay State Prison in Crescent City, California, for the crime of attempted murder—for which he was wrongfully convicted, and for other associated crimes, including a probation violation, he did not commit.

8.     Plaintiff A.I, a minor, by and through his guardian ad litem, Wendy Galvan, was, at all times relevant herein, a resident of the County of Ventura, State of California.  Plaintiff A.I. is the minor child of Ignacio Ixta Jr. A.I. has always resided, and continues to reside in the City of Oxnard, Ventura County, State of

California with his natural mother, Wendy Galvan.

9.     Plaintiff P.I.I, a minor, by and through his guardian ad litem, Ginger Martinez, was, at all times relevant herein, a resident of the County of Ventura, State of California.  Plaintiff P.I.I. is the minor child of Ignacio Ixta Jr. Plaintiff P.I.I. is the minor child of Ignacio Ixta Jr. P.I.I. has always resided, and continues to reside in the City of Oxnard, Ventura County, State of California with his natural mother, Ginger Martinez.

**DEFENDANTS**

10.     Defendant County of Ventura is a public entity with the capacity to sue and be sued, duly organized and existing under and by virtue of the laws of the State of California.

11.     Defendant Ventura County Office of the District Attorney is a separate entity and department within the County of Ventura, with the capacity to sue and be sued, duly organized and existing under and by virtue of the laws of the State of California.

12.     Defendant City of Oxnard is a public entity with the capacity to sue and be sued, duly organized and existing under and by virtue of the laws of the State of California. The City of Oxnard is a general law city, operated and governed by its council-manager form of government including a City Council and an appointed City Manager. The City of Oxnard operates, manages, maintains and controls the Oxnard Police Department.

13.     Defendant Oxnard Police Department is a public entity with the capacity to sue and be sued, duly organized and existing under and by virtue of the laws of the State of California.  In 2009, Oxnard Police Department was located at 251 South "C" Street in Oxnard, California.  All Oxnard PD detectives, including

1   detectives working in the gang unit and tagging unit worked in the same building.

2   All detectives worked on the second floor of the building and are supervised by the

3   same supervisors.

4       14.    Defendant Edward Baldwin was at all times herein a detective and

5   employee of the City of Oxnard, and peace officer/detective as defined in Penal

6   Code § 830.1.  Edward Baldwin was charged by law with, and was responsible for

7   upholding all laws (including those under the federal and California Constitution,

8   all California state laws and regulations, and all Oxnard City Municipal Codes),

9   the administration of Oxnard Police Department's, "Oxnard PD" officer activities,

10  for supervising, training, and disciplining Oxnard PD officers, with such

11  supervision, training and discipline including the duty to ensure that officers

12  complied with policies and procedures of Oxnard PD, peace officer standard and

13  training (POST), and with the laws and constitutions of the United States, and for

14  the State of California.  At all times relevant here, Edward Baldwin was acting in

15  the course and scope of his employment and agency and acted under color of law.

16  Plaintiffs sue Edward Baldwin in both his official and personal and individual

17  capacity as a supervisory official and for his own culpable acts.

18      15.    Defendant Alex Arnett was at all times herein a peace

19  officer/detective and employee of the City of Oxnard, and peace officer as defined

20  in Penal Code § 830.1.  Alex Arnett was charged by law with, and was responsible

21  for, upholding all laws (including those under the federal and California

22  Constitution, all California state laws and regulations, and all Oxnard City

23  Municipal Codes), including the duty to ensure that he complied with policies and

24  procedures of Oxnard PD, peace officer standard and training (POST), and with

25  the laws and constitutions of the United States and the State of California.  At all

26  times relevant here, Alex Arnett was acting in the course and scope of his

27  employment and agency and acted under color of law.  Plaintiffs sue Alex Arnett

28

in his official and individual capacities and for his own culpable acts.

16.     Defendant Chris Williams was at all times herein a peace officer/detective and employee of the City of Oxnard, and peace officer as defined in Penal Code § 830.1.   Chris Williams was charged by law with, and was responsible for, upholding the laws, including the duty to ensure that he complied with policies and procedures of Oxnard PD, and with the laws and constitutions of the United States and the State of California.   At all times relevant here, Chris Williams was acting in the course and scope of his employment and agency and acted under color of law. Plaintiffs sue Chris Williams in his official and individual capacities and for his own culpable acts.

17.     Defendant John Crombach was the former Chief of Police of the Oxnard Police Department in 2009/2010, when the events at issue occurred. Defendant Crombach was at all times referenced herein the Chief of Police for the City of Oxnard, and a peace officer as defined as Penal Code section 830.1.   As such, he was, during all times relevant to this complaint, the chief policymaker for defendant City of Oxnard's police department and was responsible for overseeing and implementing policies and practices followed by its officers, and other personnel.   Former Chief Crombach was charged by law with, and was responsible for upholding the laws, the administration of Oxnard Police Department, and for the hiring, supervision, training,  and disciplining of persons, agents and employees working within the Oxnard Police Department, including supervisory officials and officers. Former Chief Crombach was charged by law with ensuring all department members were trained in accordance with the California Peace Officer Standards of Training (POST).   Further, with ensuring all department members were kept, maintained and accessible to the department members who have access to them. Plaintiffs sue former Chief Crombach in both his official and personal and individual capacity as a supervisory official and for his own culpable acts.

18.     The true names and capacities of Defendants sued herein as Does 1-10 are supervisors, police officers, employees or agents of the County of Ventura, Office of the District Attorney or City of Oxnard or civilian employees, who are unknown to Plaintiffs, and who are therefore sued as Doe Defendants by such fictitious names.  Upon learning their nexus to this incident and their true identity, Plaintiffs will move to amend this Complaint to show the true names and capacities of such Doe Defendants. Does 1-10 were at all times acting within the course and scope of such relationship(s), and at all times acted under color of law.

19.     Whenever reference is made in this Complaint to any act by Defendants and Does 1-10, such allegations and references will also be deemed to mean the acts and failures to act of each Defendant individually, jointly or severally.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

20.     Plaintiffs reallege each and every paragraph alleged in this Complaint as if fully set forth here.

### A. The December 3, 2009 Shooting was the Result of Ongoing Gang Warfare Involving Gang Member, Miguel "Troubles" Cortez

21.     On December 3, 2009, a gang shooting occurred at 3310 Merced Street in Oxnard, California.  The alleged victim of the shooting was Miguel "Troubles" Cortez (hereinafter referred to as "Mr. Cortez").  He was shot in the front yard of his residence in Oxnard's Lemonwood neighborhood.

22.     Mr. Cortez had previously been designated a gang member of both the HAK and Lemonwood gangs.  Search warrants and field information cards clearly established Mr. Cortez as a hardcore member of the criminal street gang, HAK.

23.     The December 3, 2009, gang shooting incident did not occur in a vacuum.  It was a result of a series of ongoing retaliatory shootings between the

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

HAK and DSK street gangs. For example, the previous year—on January 9, 2008—Mr. Cortez was involved in the retaliatory gang shooting that occurred at the home of rival DSK gang member, Robert Gutierrez, also known as the "Guava Street Shooting Incident."

24.     The January 9, 2008, Guava Street Shooting Incident led to the procurement of search warrants. Pursuant to the search warrant—authored by Oxnard Police Department officials (including the affiant) and reviewed by a Ventura County Deputy District Attorney—Mr. Cortez' S-10 pick-up truck was located and impounded. Those search warrants clearly identified the vehicle used in the Guava Street Shooting as a white Chevrolet S-10 pick-up truck owned and driven by Mr. Cortez. At the time of the Guava Street shooting, the occupants of the Chevy S-10 pick-up truck yelled out, "H-A-K!"

25.     Oxnard PD's Detective Roger Garcia was a detective who served the search warrant at Mr. Cortez' 2440 Tulare Place residence where his Chevrolet S-10 pick-up truck was impounded. (Coincidentally, Detective Garcia was the same detective who interviewed witnesses from across the street at Merced Place on December 3, 2009.)

26.     Another retaliatory gang shooting occurred on, or about January 22, 2009. That January 22, 2009, shooting occurred at 3033 South "L" Street. The search warrant for that shooting incident mentioned an HAK shooting at the home of rival DSK gang member, Daniel Rocha. On information and belief, Mr. Cortez' close friend (and fellow HAK gang member, Alonzo Hernandez), was found to be responsible for the shooting of Rocha.

27.     Yet another retaliatory gang shooting occurred on November 27, 2009. (This shooting occurred just six days before the December 3, 2009, shooting incident, which ultimately resulted in Mr. Ixta, Jr.'s wrongful incarceration.)

28.     On November 27, 2009, Mr. Cortez was driving a gray Nissan Altima—as his Chevy truck had been impounded due to his involvement in the

January 9, 2008, shooting referenced above.  The occupants of a white Dodge Charger shot at Mr. Cortez' Nissan Altima.  The shooter shot a bullet through the trunk of Cortez' Altima.  An occupant of Mr. Cortez' Altima fired a retaliatory gun shot at the occupant of the Charger and hit that occupant in the upper arm or shoulder.

29.     After the November 27, 2009, shooting incident, Mr. Cortez became concerned that his gray Nissan Altima with unique rims and tires could be identified by the rival gang-members who were driving the white Charger that night.  The November 27, 2009, shooting prompted Mr. Cortez to remove the unique rims and eventually sell his Altima to eliminate any link establishing his involvement with the November 27, 2009, shooting.  After Mr. Cortez removed the Altima's rims, he hid them at his residence at 3310 Merced Place.

30.     On December 3, 2009, Juan Miguel Ambriz Alvarez (who was a resident at 3310 Merced) saw a white Dodge Charger on Merced Street.  Mr. Alvarez went to inform Mr. Cortez, but Cortez was not home.

31.     According to Mr. Cortez, later that evening, Mr. Cortez saw a person who looked like his friend, Alonzo, standing across the street.  When Mr. Cortez approached the person, he realized it was not Alonzo.  A brief argument ensued.  Mr. Cortez walked back to his residence as 3310 Merced Place.

32.     Witness Alfredo Flores was outside the 3310 Merced Place residence later that evening. A person was standing behind Flores' back.  The person asked for someone but Flores did not recognize the name they asked for.  Flores turned around but could not see very well who the person was because it was already dark outside.  Flores asked the person, "Oh, are you looking for Michael?"  The person said, "Yes, yes. Michael."

33.     Mr. Flores went to tell Mr. Cortez that there were people outside looking for him. Mr. Cortez asked Mr. Flores, "What happened?"  Mr. Flores told Mr. Cortez, "They're looking for you."  Mr. Cortez said to tell the guy to go to the

other door on the side of the house.  In Spanish, Mr. Flores told Mr. Cortez, "Let's get them.  There's two of us.  I got your back." Then Mr. Cortez jumped outside the window.

34.    When Mr. Cortez jumped out of the window, Cortez did not recognize the man who would should him moment later.  Mr. Cortez said, "I don't know who you are.  What do you want?" The man did not challenge Cortez to a fight.  He just said, "I just want to chat with you for a little bit." The shooter started to get closer little by little, insisting that Cortez come to talk a little with him.  Mr. Cortez said "No. No.  I have nothing to talk to you about.  I don't know what you want."

35.    Then Mr. Cortez said, "This is not my house.  I don't want trouble here…Get out of here.  If you guys want to get even, I'll bring my friends.  We'll get even, you know, but not right here."

36.    Mr. Cortez said he and Mr. Flores ran towards the inside the house.  There was only one shot fired and it hit Cortez.  Mr. Cortez ran towards the kitchen, and Mr. Flores ran to his room.   Mr. Cortez fell inside the living room/kitchen.

37.    Following the December 3, 2009, shooting, Mr. Cortez was interviewed by Oxnard Police Department Officer Vega and Officer Velasquez.  Mr. Cortez told Officers Vega and Velasquez that he did not know who the shooter of the December 3, 2009, shooting was because it was "too dark."

38.    Three eyewitnesses described three men to the Oxnard Police Department the night of December 3, 2009. None of the eyewitness descriptions matched that of Mr. Ixta, Jr. Two people who described the shooter (one of three men on foot) described the shooter as tall, stocky, wearing a beige cowboy hat, white T-shirt and blue jean shorts. (Ixta Jr. is small, thin and far from "stocky".) No cowboy hat or blue jean shorts were found in Ixta Jr.'s home when it was searched.

**B. Defendant Detectives' Coerced Misidentification**

39.     That same day (December 3, 2009) Detective Alex Arnett (now a commander with Oxnard Police Department) interviewed Mr. Ixta, Jr.'s brother, Eric Ixta.  Detective Arnett was focused on Mr. Ixta Jr.'s brother.  Eric Ixta told Detective Arnett that he had just come from the family home of his girlfriend, Joanna Larios, which family home was across the street from the Cortez residence.

40.     Detective Roger Garcia—the detective who had served the search warrant at Mr. Cortez' 2440 Tulare Place residence and impounded Cortez' Chevrolet S-10 pick-up truck the year prior—also interviewed witnesses at the same house across the street from Cortez' on December 3, 2009.

41.     Following his interview of Eric Ixta, Detective Arnett created a six-pack photo lineup.  In the 6-pack lineup, Detective Arnett chose to include a photograph of Mr. Ixta, Jr.

42.     Detective Arnett included Mr. Ixta, Jr.'s photograph in the packet shown to Mr. Cortez because he "conducted a background check on Eric Ixta, who was believed to have ties to local gangs, and found some individuals that he associated with.  According to Detective Arnett: "One of them was—and I don't know how they're related, whether they're brothers or cousins—but I found [Mr.] Ixta, Jr. as well as the other individuals, that I ultimately included in photo lineups….that's how I ended up putting the defendant (Mr. Ixta Jr.) in the photo lineup."

43.     Ultimately, Mr. Ixta, Jr. ended up in the photo lineup shown to Mr. Cortez not because of any eyewitness testimony, identification, or physical evidence or known motive connected him to the shooting—but because he was associated with or related to a man, Eric Ixta, and because the City of Oxnard, Oxnard Police Department and Detective Arnett intentionally and deliberately chose to include that photo in the packet.

44.     Detective Arnett went to the hospital to interview Mr. Cortez who was

in a hospital bed after having surgery.  Seated next to him approximately 5-7 feet was Cortez' girlfriend of six years, Brenda Cervantes ("Ms. Cervantes").

45.     Detective Arnett showed the six-pack photo lineup to Mr. Cortez. Arnett asked Mr. Cortez whether any of the six individuals displayed in the six-pack photo lineup was the shooter.

46.     After looking at the line-up for several seconds, Mr. Cortez nodded his head in the affirmative that he could identify someone out of the first line-up. Mr. Cortez pointed to Picture #5, which was the picture of Mr. Ixta Jr.  Detective Arnett asked Mr. Cortez if the person in Picture #5 was the person who shot him. Arnett said, "Number 5" out loud. Mr. Cortez' girlfriend, Ms. Cervantes—who had been at the 3310 Merced Place residence on the night Cortez was shot (but who has admitted she did not see the shooter)—was still seated 5-7 feet from where Cortez laid in the hospital bed.  Ms. Cervantes listened intently to Mr. Cortez' conversation with Detective Arnett as the two discussed the shooter's identity.

47.     As Ms. Cervantes listened closely, Mr. Cortez said, "I think so." (Later, Mr. Cortez confided in his friend and housemate, Juan Alvarez, that the reason Cortez identified Mr. Ixta Jr. was because Cortez did not think that Mr. Ixta, Jr. looked "hard" in the photograph—and therefore, Mr. Ixta Jr. was less likely to "make any problems" for Cortez.)

48.     Detective Arnett then asked Ms. Cervantes to step outside the small hospital room.  Moments later, Detective Arnett walked outside the room to speak with Ms. Cervantes.  Detective Arnett did not change the order of the six-pack photographs he had just shown Ms. Cervantes.  Ms. Cervantes looked at the same six-pack for about ten seconds, then—because she had heard her boyfriend identify the shooter as "No. 5" just a few moments earlier, Cervantes, too, pointed to Mr. Ixta Jr.'s picture as No. 5.  (*Importantly, Ms. Cervantes identified Mr. Ixta Jr. as the person she had seen outside earlier that evening—as opposed to the shooter— because Ms. Cervantes did not personally witness the actual shooting incident.

49. After Detective Arnett's visit with Mr. Cortez and Ms. Cervantes at the hospital, Detective Arnett showed the six-pack photos to other witnesses (Ramon Alvarado and Alfredo Flores) who had seen the shooter that night. Neither Ramon Alvarado nor Mr. Flores could identify anyone from the photos.

50. On December 15 or 16, 2009, Detective Edward Baldwin interviewed Mr. Cortez at his residence. Detective Baldwin brought with him Detective Arnett's six pack photo lineups. Detective Baldwin interviewed Mr. Cortez again because in Cortez' initial interview with Officers Vega and Velasquez (which occurred on the same day as the shooting), Cortez said, "he could not be sure" who the shooter was.

51. During the interview, Mr. Cortez asked Detective Baldwin, "Is there nothing you guys can do without me speaking out?" Detective Baldwin responded, "Well, that's the biggest thing. You know, if you don't have a victim, you don't have a crime, okay?" Detective Baldwin then remarked that the last time Detective Arnett showed the pictures, Mr. Cortez "kind of sort of identified someone."

52. Detective Baldwin changed Mr. Cortez' identification by giving Cortez an incentive to misidentify Mr. Ixta, Jr. as the shooter. Detective Baldwin told Cortez: "You have a big hospital bill ...You know, just think about that. You are going to be paying for some other dumbass.... Plus, if you don't cooperate, the state's Victim Compensation will send us a form, asking, "Hey, should we help him out with his medical bills?" And we will answer, "Why, no, he is not cooperating." So, it's almost like you brought it on yourself."

53. Before showing Mr. Cortez the six-pack photos against, Detective Baldwin explained to Mr. Cortez, "So what I'm gonna do is I'm gonna show you the exact same lineups again, okay?" In essence, Detective Baldwin was indirectly alerting Mr. Cortez that he was going to show Cortez the exact same six-pack photo lineups as before. In other words, Detective Baldwin was tipping Cortez off to the fact that he was using the exact same phone lineup that Cortez and Cervantes

1    had previously identified Mr. Ixta Jr. as "No. 5" at the hospital.

2         54.   Detective Baldwin then reminded Mr. Cortez, "even if you go through

3    this, you know, the fact that you're helping cooperate, you know, if we get a letter

4    from the Victims' Advocate people, you know, you're trying to cooperate to the

5    best of your ability…At the same time I can't guarantee you the fact that if you do

6    or do not identify, I can't tell you that that's gonna automatically solve the case.

7    Okay?  Number one, the first thing a defense attorney is gonna bring up is the fact

8    that you were questionable on the first time.  Yeah, we'll be able to explain it,

9    "Hey, he was afraid for his family.  He was afraid for his girlfriend," those things,

10   but if you're on a jury, that may lend a little bit of doubt, okay?"

11        55.   Shortly after, Detective Baldwin showed Mr. Cortez the photo

12   lineups.  The first six-pack did not contain Mr. Ixta Jr.'s photo.  The second lineup

13   does.  Mr. Cortez said, "That."  Detective Baldwin replied, "That one right there?

14   That's number five.  Okay, good enough."

15        56.   Detective Baldwin continued his undue influence over Mr. Cortez by

16   pressuring him to falsely identify Mr. Ixta Jr., and by instructing Mr. Cortez to

17   testify at trial that the reason Cortez was unable to identify the shooter twice before

18   (i.e., first, during his initial interview with Officers Vega and Velasquez; and the

19   second, when he told Detective Arnett he was not really positive) was because

20   Cortez was afraid for his family and girlfriend's safety.

21   **C. Search of Mr. Ixta Jr.'s Residence**

22

23        57.   On December 15, 2009, Detective Baldwin authored a search warrant

24   for Mr. Ixta Jr.'s residence.  During the search, several items related to Mr. Ixta Jr.

25   were located and seized pursuant to the search warrant.  According to Baldwin,

26   noteworthy items included a dark blue and gray jacket which looked similar to the

27   Dallas Cowboys colors, as well as a pair of blue gloves with the Dallas Cowboys

28   five pointed stars on them.

**D. Detective Baldwin's Deceptive Phone Call with Mr. Ixta Jr.'s Father**

58.     When learning about the search warrant at Mr. Ixta Jr.'s

grandmother's house and that police were looking for Mr. Ixta Jr., Mr. Ixta Sr. called the Oxnard Police Department. On December 22, 2009, Detective Baldwin spoke with Mr. Ixta Jr.'s father, Ixta Sr.  Based solely on this photo identification and the shirt obtained in the search warrant, Detective Baldwin told Mr. Ixta Jr.'s father (Ixta Sr.) that he wanted to interview his son.  Ixta Sr. specifically asked Baldwin if his son was a suspect in what he believed was a murder.  Baldwin told Ixta Sr. that his son was not a suspect but a witness or investigative lead. Baldwin's justification for his otherwise misrepresentation was that it was not a murder but an *attempted* murder.  In other words, Mr. Ixta Jr. was actually not a murder suspect, but an attempted murder.

59.     Mr. Ixta Jr. went to the Oxnard Police Station with his father, Mr. Ixta Sr. Mr. Ixta Sr. drove the long distance from the Ixta family home in Arizona to help the detectives remove any doubt that his son, Ignacio Ixta Jr., was involved in the shooting.

60.     At approximately 9:15 p.m. on December 22, 2009, Mr. Ixta Sr.

arrived at the Oxnard police station with his son, Ixta Jr's mother, and Mr. Ixta Jr.'s girlfriend.  Mr. Ixta Sr. gave Baldwin the name and phone number of an attorney they had scheduled an appointment with the following morning.  Baldwin wrote this information on a piece of paper.  The family told Baldwin not to talk to Mr. Ixta Jr. unless his attorney was present.   Baldwin explained to them that was perfectly fine that they had consulted with an attorney.  Mr. Ixta Sr. explained his displeasure that Baldwin had not told him that his son was the primary suspect in a shooting.  Baldwin explained to Mr. Ixta Sr. that he asked Baldwin if his son was a primary suspect in a murder, and Baldwin had answered that question

appropriately and stated that he was not.

61.    As soon as Mr. Ixta Jr. arrived at the police station, he was handcuffed, arrested, and Mirandized.   Baldwin observed that Mr. Ixta Jr. was wearing a navy blue jacket, blue jeans and a pair of Navy Blue Nike Cortez shoes. After reading his Miranda rights, Mr. Ixta Jr. was asked if he wanted to tell his side of the story.  By doing this, Baldwin took it as a waiver of Mr. Ixta Jr.'s Miranda rights.

62.    Mr. Ixta Jr. explained that he had a girlfriend who was approximately three months pregnant with his child.  Mr. Ixta Jr. told Baldwin that he is very close to his brothers and hangs out with his brother, Eric Ixta.  Baldwin found it significant that the crime occurred on December 3rd and that the family had arrived in Oxnard on December 2nd.

63.    Baldwin explained to Mr. Ixta Jr. that the victim and a witness had been shown multiple photographic lineups and identified him as the shooter.  Mr. Ixta Jr. had no answer for Baldwin.  He told Baldwin that he did not know how the shooting happened as he was not there when the shooting took place.  He told Baldwin that he was only aware of the shooting because his brother, Eric, had told him later that day when he was back at his grandmother's house.

64.    Finally, Mr. Ixta Jr. told Baldwin that he was not a Colonia Chiques gang member.  Mr. Ixta Jr. admitted he had friends from all over Oxnard; and associated with individuals from Colonia Chiques, as well as other gangs throughout Oxnard.

65.    As a result of the actions of the City of Oxnard, Oxnard Police Department, Detective Arnett's photo lineup and Detective Baldwin's undue pressure, which coerced Mr. Cortez into falsely identifying Mr. Ixta, Jr. as the shooter, and the entire police department ignoring the fact that the department had

proved two of Mr. Cortez' vehicles were involved in the drive-by shootings, Mr. Ixta Jr. was arrested and charged with attempted murder.

### E. Mr. Ixta Jr.'s Defense Attorney's Specific Request for Information Pertaining to Mr. Cortez' Involvement in HAK

66.    Mr. Ixta Jr.'s attempted murder trial began on December 6, 2010.  In October 2010, Ixta Jr.'s criminal defense attorney, Robert Schwartz, spoke with Detective Chris Williams from Oxnard Police Department.   Schwartz asked Detective Williams if Williams had any knowledge of Mr. Ixta Jr. being a member of Colonia Chiques or if Williams knew anything about the victim, Mr. Cortez. Detective Williams told Schwartz it was probably worthwhile to get stuff with respect to Mr. Cortez.

67.    Detective Williams' glaring statement that "it was probably worthwhile to get stuff with respect to Mr. Cortez" caused Mr. Schwartz to telephone Deputy District Attorney Joann Roth.  Schwartz left a message for DDA Roth to call him back.

68.    On October 14, 2010, Mr. Schwartz called and left another message for DDA Roth asking for all discovery regarding HAK and Mr. Cortez.

69.    Mr. Schwartz then called again on October 19, 2010.  He was informed that DDA Roth was out of the office until November 10, 2010.

70.    When Mr. Schwartz finally had a chance to speak with DDA Roth, Schwartz demanded all the gang information on HAK, specifically with respect to Mr. Cortez. DDA Roth told Mr. Schwartz that the Ventura District Attorney's Office has a policy of not routinely turning that type of information over to the defense.  As an additional way to deter Schwartz's discovery demand, DDA Roth threatened that she could refile the gang allegation on Mr. Ixta Jr.

### F. Mr. Ixta Jr.'s Attempted Murder Trial

71.     Before witnesses testified at the trial, Schwartz explained to the trial judge that he wanted any and all information DDA Roth had relating to Mr. Cortez and his involvement, or lack thereof, in HAK, or any other gang, or tag bangers, that Roth had within her possession.

72.     DDA Roth told the judge that she had had a conversation with Mr. Schwartz, and told Schwartz that he would have to make a formal motion to the court in order to litigate whether or not Mr. Cortez' contacts were relevant. Ms. Roth said that getting into the victim's gang contacts is completely irrelevant in the People's position.

73.     Mr. Schwartz informed the court that he had asked DDA Roth for the gang stuff on Mr. Cortez who told Schwartz, "That's not our policy.  If you want to do it, you have to bring a formal motion."  DDA Roth taunted, "I could refile the gang allegation."

74.     The judge ordered the discovery be disclosed to Mr. Ixta Jr.'s criminal defense attorney.  Ixta Jr.'s attorney never received vital Brady information regarding Mr. Cortez' prior gang-related criminal activities from the Ventura County District Attorney county lawyers, Oxnard Police Department, or any other member of the prosecution team despite multiple people within each agency knowing of its existence.  The Brady evidence Mr. Schwartz was seeking from Oxnard Police Department was included under the umbrella of California Penal Code section 1054 et seq., which requires the defense to seek information from the prosecutor rather than to request it directly from the law enforcement agency.

75.     Pursuant to California's Proposition 115, Mr. Ixta's defense counsel's ability to independently obtain the information from Oxnard Police Department was curtailed.

76.     During Mr. Ixta Jr.'s trial, the prosecution, the Ventura County Office of the District Attorney's prosecutor Joanne Roth, touted Mr. Cortez "as this innocent former tagger"—even though it was well known within the Oxnard PD's

1   Gang Unit that Mr. Cortez was considered "hard" and an active gang member in

2   2009 and two of his vehicles were involved in gang-related shooting which the

3   Oxnard PD and DA's Office was aware of.  In fact, each warrant for each shooting

4   is received by a DDA before it is given to a judge to e to review.

5       77.   At trial, Mr. Cortez identified Mr. Ixta, Jr. as the shooter.

6       78.   Mr. Cortez testified that the shooter said, "Michael, Michael, come

7   here."  Cortez said, "No.  Get out of here.  If you guys want to get even, I'll bring

8   my friends.  We'll get even, you know, but not right here."  DDA Roth asked

9   Cortez, "Even for what?"  Cortez stumbled in his response.  Knowing that his "get

10  even" statement hinted at retaliation for a prior act he may have been involved in,

11  Cortez said, "Just---when you want to get eve---I mean, like fight—guys two on

12  one.  You know?..."

13      79.   Cortez testified that he was untruthful with police officers because he

14  was just scared of retaliation. He decided to cooperate when identifying the

15  defendant as the shooter because of his bills. Cortez testified that he no longer was

16  a member of HAK because being in the gang was not worth writing letters on the

17  wall and stuff.

18      80.   When pressed about his initial questionable identification, Mr. Cortez

19  explained that his reluctance to identify Mr. Ixta, Jr. as the shooter was due to fear

20  and retaliation—just as Detective Baldwin had instructed him.

21      81.   Mr. Cortez admitted that he had previously described the shooter was

22  a little bit shorter than Cortez' own height of 5 foot 9 inches. Ixta Jr.'s defense

23  attorney had Mr. Ixta Jr. stand up inside the courtroom.  Mr. Ixta Jr. is 5'11. Mr.

24  Cortez then changed his testimony, and said, "Maybe he was taller.  But I know it

25  was him.  No doubt.  I don't care what you say.  I know it was him.  I'm trying to

26  help out as much as I can.  You guys get him in jail.  Get him in jail.  If not, it's on

27  you guys."

28      82.   At the end of his cross-examination, Mr. Cortez was smiling at Mr.

1   Ixta Jr.'s defense attorney.  When Ixta Jr.'s defense attorney asked Cortez if

2   something was funny, Cortez responded he was laughing because he was "not over

3   there, but over here."  Ixta Jr.'s defense attorney responded by telling Mr. Cortez

4   that the situation was "serious."  Amused, Cortez said the situation was "quite

5   serious" for Mr. Ixta Jr.  It was his life.

6        83.    Ms. Cervantes also testified at the trial.  She testified that she had seen

7   Mr. Ixta Jr. that night.  She identified Mr. Ixta Jr. as the shooter in Detective

8   Arnett's six-pack photo lineup.  However, she recanted since she did not actually

9   witness the shooting itself or see the shooter.  Her identification was to the person

10   Mr. Cortez saw earlier in the day. As a consequence of Oxnard's failure to disclose

11   Mr. Cortez' prior criminal activity, Ms. Cervantes was able to avoid impeachment

12   when she testified that she was unaware of Mr. Cortez being in any gang even

13   though she had been his girlfriend for six years.  Cervantes said she did not

14   recognize the term, "Hell Awaits Krew," and also said she was unfamiliar with a

15   tattoo on Cortez' hand that said HK.

16        84.    Detective Arnett was called as a gang expert witness for the

17   prosecution.   Arnett testified that Colonia Chiques rivals all gangs, including

18   tagging crews.  Colonia Chiques don't get along with any gangs or any other types

19   of tagging crews.

20        85.    Arnett did not testify as to HAK.  Arnett testified that in Oxnard there

21   were six different Hispanic criminal street gangs.  However, Arnett did not include

22   HAK as a criminal street gang, even though HAK was a street gang at the time,

23   and Arnett knew it.

24        86.    Because it was undisputed that: (a) no actual lineup was conducted

25   where the witnesses could see the size of the suspects; (b) no weapon was found in

26   the search of the Ixta home; (c) Mr. Ixta Jr. was not on any gang lists or rosters; (d)

27   no admissions were made by Ixta Jr. that tied him to Cortez' shooting; (e) Mr. Ixta

28   Jr. had an alibi that he was with his pregnant girlfriend that evening; and (f) he

drove for hours to secure his innocence—the case hinged on Cortez' identification of Mr. Ixta Jr. as the shooter, and what motive would Cortez have for misidentifying Mr. Ixta Jr. as his shooter.

87.     During closing argument, DDA Roth included a PowerPoint slide which read, "Miguel [Cortez] had no motive to lie.  He was 100% of the Defendant's identity.  And Miguel [Cortez] has everything to lose.  Nothing to gain.  No benefits.  No money." (304)  DDA Roth told the jury, "…Let's talk about Miguel Cortez.  He has absolutely no reason to lie to you.  He has no motive."

88.     In defense attorney Schwartz's closing argument, Schwartz asked the jury: "What evidence does—that Mr. Ixta [Jr.] has to do with Colonia Chiques? Zero.  None.  None at all.  None.  Whoever did this to Mr. Cortez is a member of Colonia Chiques.  Mr. Ixta [Jr.] is not a member of Colonia Chiques.  Okay.  He never has been, never will be, and was not on December 3, 2009.  He's not a member of Colonia Chiques.  That's who shot Miguel Cortez.  Somebody who's a member of Colonia Chiques, and they did it for what reason?  We don't know."

89.     In rebuttal, Ms. Roth told the jury, "Miguel [Cortez] had no reason or motivation for lying to you.  He put everything on the line, and life would be so much easier today if he didn't make that identification.  Because when you take on Colonia Chiques, and you take on somebody who's willing to shoot you in the back as you run away, you'd better be damn sure that you are 100 percent accurate and correct.  And he came in here, and he told you that he is 100 percent certain."

90.     Mr. Ixta Jr. was found guilty. Only 21 years old at the time, Ixta was wrongfully convicted and sentenced to 34 years to life in state prison.  At the time of his sentencing, Mr. Ixta, Jr. had two biological children: a 3-year-old son, A.I.; and a five-month-old son, P.I.I. Mr. Ixta, Jr. spent over a decade of his life in Pelican Bay State Prison serving time for an attempted murder he did not commit.

91.     Pelican Bay is a "supermax" prison.  Its primary purpose is the

1   housing of violent inmates and gang affiliated offenders.  Almost one-half of its

2   prisoners are serving life sentences. When other California prisons cannot handle

3   violent offenders-they are sent to Pelican Bay.[1] Pelican Bay is home to the Security

4   Housing Unit (the SHU) one of the oldest confinement isolation units in the

5   country where inmates can spend 22 ½ hours per day in isolation.[2] The doors are

6   solid metal, and an inmate cannot see another person while in the cell.

7   **G. The Ventura County District Attorney's Infamous Honeybadger**

8   **Practice in Gang-Related Cases**

9   92.    In July 2006, author for the Ventura County Star, Raul Hernandez,

10   wrote an article titled, "Harsher penalties for gangs fuel debate—Felony

11   enhancements can be abused, critics say." In the article, Mr. Hernandez notes

12   "prosecutors and police in Ventura County often apply the gang enhancement to

13   people with tenuous or outdated connections to a gang…The DA likes to add the

14   gang enhancement because it strengthens the case, said Ventura defense attorney

15   Victor Salas. The connection might be a little light, but they still like to do it."

16   "Attorney David Hirsch of the Ventura County Public Defender's Office is critical

17   of the use of the gang-enhancement law during a trial…[Hirsch] said his client

18   didn't get a fair trial because the gang allegations overshadowed the crime."

19   93.    Also, in the October 2008 edition of Citations magazine, Judge

20   Guasco shadowed DA Joann Roth. Judge Guasco noticed "the very high

21   percentage of charged offenses relating to alleged gang activity." But most

22   importantly, is a statement made by the prosecutor who prosecuted Mr. Ixta Jr.

23   (Joann Roth) printed in the Simi Valley newspaper. In the December 2008 article,

24   Ms. Roth was quoted saying:

25

26   [1] *See* Films Media Group-Lockdown Gang Wars-Inside Pelican Bay State

27   Prison (2006), *available at*: https://www.films.com/id/17058

28   [2] Sullivan, Laura. At Pelican Bay Prison, a Life in Solitary (2006) NPR,
      *available at*: https://www.npr.org/templates/story/story.php?storyId=5584254

"The district attorney's office will do everything in our power to bust up that (Westside Locos) gang and send every one of them to prison," she said. "That's my goal."

94.    In December 2011, Ventura County Star's Raul Hernandez wrote another article entitled, "Former prosecutors say DA's office held trial competitions for years."  The article described the custom, policy and practice of the DA's office recognizing prosecutors who try the most cases every quarter (both felonies and misdemeanors). It described the custom and practice of management rewarding their "hard-charging" and "aggressive" prosecutors, who believe a "swing", in the form of charges and a trial, should be taken at every defendant regardless of purported guilt or innocence, and also regardless of the facts of the case.  Attorneys who had left the DA's office before 2007 and 2008, prior to the December 3, 2009 shooting, opined in that article that management pushed prosecutors to take cases to trial regardless of guilt or innocence of the accused.

95.    In 2011, a prosecutor and supervisor of the Ventura County District Attorney's Office's Narcotics and Misdemeanors Unit, outlined a trial competition to her subordinates, as addressed in the Hernandez article. The supervisor's memorandum became known as the "honey badger" memo because the supervisor encouraged staff to "learn" from the aggressive honey badger who does not care about its challengers but presses on.

96.    Two former prosecutors from the DA's Office stated in the article that trial competition had been going on for years, and they are management-driven to pump up the office's trial statistics.  David Lehr, who worked at the DA's Office for more than 13 years, said management would sometimes "turn up the heat" and push prosecutors to take cases to trial regardless of whether there was proof beyond a reasonable doubt. Christopher Hinkle, who was a prosecutor in the DA's Office for three years from 2005-2008 said, the marching order to try more cases come from the top.  Lehr added that the younger and new prosecutors often were

1    pressured to try cases and did so because of the fear of being demoted or losing

2    their jobs.

3       97.    "Trial at all costs" and "win at all costs" was the practice within the

4
     Ventura County District Attorney's Office when Mr. Ixta Jr. was denied a fair trial.
5

6    **H. Dr. Natalie Cherot's Independent Investigation into Plaintiff's**
        **Wrongful Arrest and Incarceration**
7
        98.    Many years after Mr. Ixta Jr.'s wrongful conviction, in 2015,
8

9    investigative journalist (and former social science professor) Natalie Cherot, Ph.D.

10   became interested in Mr. Ixta Jr's case while researching Oxnard criminal street

11   gangs. Dr. Cherot undertook the rigorous process of scientific peer review on

12   collective identity and how organizations develop community narratives. Dr.

13   Cherot read the Ixta Jr. trial transcript, at the behest of Mr. Ixta Jr.'s parents.

14   Following that reading, she undertook an extensive investigation of the underlying

15   facts entirely on her own without remuneration.

16      99.    Dr. Cherot conducted a series of witness interviews related to the

17   December 3, 2009 shooting of Mr. Cortez.  One of the people whom Dr. Cherot

18   interviewed asked Dr. Cherot if she was aware of the evidence that implicated Mr.

19   Cortez (the victim) to some other gang-related shootings.

20      100.   Most significantly, Dr. Cherot interviewed "Witness 1" on July 16,

21   2016, and March 17, 2017.

22      101.   Witness 1 was a resident at 3310 Merced on December 3, 2009.

23   Witness 1 told Dr. Cherot that a shooting occurred on November 27, 2009,

24   between the occupants of Mr. Cortez' Nissan Altima and the white Dodge Charger.

25      102.   Witness 1 told Dr. Cherot that a shooter from inside the Charger shot

26   a bullet through the trunk of Mr. Cortez' Altima.  Witness 1 said an occupant of

27   the Altima (driven by Mr. Cortez) fired a gunshot in retaliation and hit the

28   occupant of the Charger in the upper arm or shoulder.

103.   Witness 1 also told Dr. Cherot that six days later (on December 3, 2009), Witness 1 saw the white Dodge Charger on Merced Street.   Witness 1 attempted to inform Mr. Cortez, but Cortez was not home.

104.   Witness 1 had seen the custom rims hidden in the 3310 Merced residence and knew that Cortez was aware that his Altima could be identified by the rival gang in the Charger.

105.   Most importantly, Witness 1 told Ms. Cherot that the reason Mr. Cortez identified Mr. Ixta Jr. as the shooter was because Mr. Cortez did not think Mr. Ixta Jr. was "hard"; and therefore, would not make any problems for him.

106.   Dr. Cherot also interviewed Witness 2—an HAK gang member.   Dr. Cherot showed Witness 2 crime scene photos of the custom rims from Mr. Cortez' house on the day Mr. Cortez was shot.   Witness 2 confirmed that the custom rims in the crime scene photo, indeed, had been on Mr. Cortez' gray Nissan.   Thus, Mr. Cortez' truck had been identified as involved in a gang shooting, was found at his house with the rims from his other car, also involved in a gang shooting  were found in his house.   Yet the police and the DA said he was not involved in a same gang and refused to produce evidence that he did despite a court order.

107.   Dr. Cherot also interviewed Lisa Martin and Manuel Martin on July 21, 2006.   Lisa Martin said that she heard Mr. Cortez tell her son (Alfonso Hernandez), "There are some guys we are going to have problems with."   Manuel Martin told Dr. Cherot that "…he might have seen a 2004 white Dodge Charger around the time of the shooting."

108.   Dr. Cherot also interviewed Witness 3.  Witness 3 told Dr. Cherot, "[Mr. Ixta Jr.] didn't do this.  [Mr.] Cortez needs to come back to Oxnard and straighten this out."

**I. Revelation of Oxnard Police Department's Brady Violation**

109.   Prior to Mr. Ixta Jr.'s release, attorney Andrew Wolf had been hard at work trying to have Mr. Ixta Jr.'s conviction overturned. An initial petition

1   for writ of habeas corpus was filed in the Ventura Superior Court and was
2   summarily denied within one or two days after the filing. The next petition was
3   filed in the Court of Appeal, Second Judicial District, Division Six.

4       110.   The petition filed in the Court of Appeal was based primarily on
5   the grounds of prosecutorial misconduct, and on the admission of expert testimony
6   at the time of the trial which would now be barred under the holding of *People v.*
7   *Sanchez*. (*People v. Sanchez*, (2016) 63 Cal.4th 665.)  As of the date of the filing
8   of the Habeas Petition in this court, there had been no determination whether the
9   *Sanchez* decision was retroactive. While the case was pending, two separate
10  decisions were issued from a different Appellate District, which held that the
11  *Sanchez* decision was not retroactive.  Petitions for review of those appellate
12  decisions were denied by the California Supreme Court.

13      111.   In or about December 2019, the first of four search warrants was
14  discovered and provided to Mr. Wolf in early January 2020.  The search warrants
15  indicated that Ventura County DDA Kasey Sirody signed off on a search warrant
16  affidavit for a search of Mr. Cortez' residence at 2440 Tulare Place and his truck.
17  Oxnard PD's Detective Jeff Long's search warrant probable cause affidavit stated:
18  "Based on my training and experience, I know HAK to be a tagging crew that
19  started several years ago in the City of Oxnard.  Over the years, the HAK tagging
20  crew has been increasingly violent and involved in shooting of rival ragging crews
21  and gang members.  The HAK tagging crew also has been involved in several
22  violent assaults over the years.  Based on their violent activities, the HAK tagging
23  crew is now classified as a criminal street gang under Penal Code 186.22 by the
24  Oxnard Police Department."

25      112.   Leave was requested from the Court of Appeal to file an amended
26  petition in that court.  The request was granted.  The amended petition was filed
27  which referenced information in the four search warrants which unquestionably
28  demonstrated that representations made by Joann Roth, the deputy district attorney

who prosecuted Mr. Ixta Jr., were false.  It was further alleged in the amended petition that the information contained in the search warrants was known to Ms. Roth, or should have been known by her as the warrants had been submitted for review to the District Attorney's Office and her fellow DDAs who prosecuted gang prior to submission to the magistrate.  The applications for the warrants had, in fact, been reviewed by deputy district attorneys although not by Ms. Roth but by her friends and co-workers.  The existence of the warrants and the facts and circumstances stated therein were never provided to the defense at the time of the trial in violation of Mr. Ixta Jr.'s constitutional rights as discussed by the United States Supreme Court in the *Brady v. Maryland* decision.  (*Brady v. Maryland*, (1963) 373 U.S. 83, 83 S.Ct. 1194.) Additionally, Roth also told the jury during the Ixta Jr. trial that Cortez had no motive to lie, and was 100% certain of the defendant's identity. Neither was true.

113.   In March 2020, the Court of Appeal issued its ruling, which denied the petition. The formal ruling made reference to the two appellate decisions which held that *Sanchez* was not retroactive.  The ruling made no reference whatsoever to any of the facts, allegations, and contentions contained in the amended petition.

114.   The next Habeas Petition was filed in the California Supreme Court.  It focused on the Brady violations and prosecutorial misconduct.

115.   Shortly after that petition was filed in the California Supreme Court, Mr. Wolf—acting principally out of frustration—sent a lengthy analysis to the district attorney of Ventura County detailing the circumstances.  Mr. Wolf was subsequently informed that the matter was being referred to the Conviction Integrity Unit of the District Attorney's Office for review.

116.   The Conviction Integrity Unit's investigation allegedly uncovered several facts. For example:

a.   There was no shared place for search warrants at Oxnard PD.

Detective Arnett admits there is not a file at Oxnard PD where all warrants are kept. Nor is there a uniform procedure for sending stuff to the DA's Office. Sergeant Thomas said that if he wrote a search warrant for a case, he would return it to the courts after service was completed.  Thomas would usually keep a hard copy in a file in his desk, but he could not recall if signed copies were ever put on a computer.  Thomas could not remember what his exact filing system was at the time of Ixta Jr.'s investigation and prosecution.  There was a shared computer file in the graffiti unit for information like tagging photos, but Thomas could not recall if search warrants were ever put there.

b.  <u>Officers preparing gang packets did not have access to search warrants</u>. Gang packets were put together at the time by mainly two Oxnard PD employees named Sean O'Brien and Denise Hamilton. Sergeant Long did not think O'Brien would have been able to look up actual search warrant and they were usually not included in a gang packet; however, the case reports related to the search warrant usually came up and were included. O'Brien admitted that he would not have access to search warrants unless search warrants had been scanned into one of the computer systems, but O'Brien did not recall ever including search warrants in the gang packets he prepared because there was not a system he could check for search warrants.  Instead, detectives held onto their own warrants. O'Brien did not think they were placed anywhere else.

c.  <u>There was no communication between the Oxnard PD's Gang Unit and Tagging Unit</u>.  Officer Plymire was the officer who prepared Cortez' search warrant.  Plymire said that when she was done with a search warrant a copy would probably be placed in a file in the OPD graffiti office.  But Plymire had no idea if Cortez' search warrant would still be there. Moreover, Arnett said that the gang unit and tagging unit were not located in the same area of the police station. The two offices were separated by a hallway.  They did not have regular meetings to discuss current cases.

d.  <u>Oxnard PD's is unable to explain why the search warrants and reports were excluded</u>.  Arnett could not think of a reason why reports related to the HAK drive-by shootings would have been excluded from Ixta Jr.'s criminal case.  Arnett also did not know why these reports were not submitted to the DA's Office—even though Arnett admitted the search warrants were very valuable and that he, himself, was involved in the service of the warrant since Arnett's initials and ID Number were on some of the property receipts.

117.  Of course, the reality is that some of the officers involved in the undisclosed search warrants are the same officers who work with and are supervised by the same supervisors involved in the prosecution of Mr. Ixta Jr.  Further, the idea that because there was no central report for search warrants—if that is even true—could have been solved by simply running all contacts Oxnard Police had with the residence address where Mr. Cortez lived.  In 2009-2010, the Ventura County DA's Office had a DDA assigned to Oxnard Police Department who worked at the Oxnard Police Department and reviewed police reports, search warrants.  There are multiple ways and multiple people within Oxnard Police Department and Ventura Count District Attorney's Office involved in the drafting, review, and execution of the search warrant that were also involved in the investigation and prosecution of Mr. Ixta Jr.

118.  After the Conviction Integrity Unit's review of the matter, Mr. Wolf was informed that—while not conceding any prosecutorial misconduct—the District Attorney's Office had concluded that Mr. Ixta Jr. was entitled to have his conviction overturned.  By agreement with the assigned Senior Deputy District Attorney, a new Habeas Petition was filed in the Ventura Superior Court.  The principal ground referenced was the *Brady* violation resulting from the non-disclosure of the four search warrants and the facts stated therein which demonstrated that Ms. Roth had misstated critical evidence related to the victim.  The Office of the District Attorney, after consulting with one or more

representatives of the California Attorney General's Office, filed its response to this petition.  The response agreed that the conviction was to be overturned.

119.   At the hearing in which the conviction was overturned, Ventura County District Attorney Erik Naserenko announced that Mr. Ixta Jr. would not be re-tried for the offenses for which he had been convicted.

120.   Ventura County District Attorney Erik Nasarenko stated in his April 12, 2021 press release:

> "In 2020, our Conviction Integrity Unit learned that four search warrants involving one of the prosecution's key witnesses had not been provided to our office with Mr. Ixta Jr.'s case materials." "While not specific to Mr. Ixta [Jr.]'s case, these search warrants contained information that directly reflected upon the credibility of the key witness and, as such, were required under the law to be discovered to the defense." Nasarenko said that since the information could have led to a different outcome in Ixta's trial, "we determined he was legally entitled to reversal of his convictions." The D.A.'s office has also declined to retry the case, citing the search warrant evidence, faded memories and changes in case law applicable to the introduction of gang evidence."

121.   The phrase "not specific" to Mr. Ixta's case is not accurate. One of the search warrants was for Mr. Cortez' house and his truck which was positively identified as the vehicle used in a drive- by-shooting.  The Guava Street shooting and related search of Mr. Cortez' residence is specific to this shooting.  It is logged in the computer system (as is every call-for-service to a residence.) Therefore, if anyone had run Mr. Cortez' address in the Oxnard PD computer system it would have revealed the search warrant being executed at Mr. Cortez' house or his car.  Also, if someone had run Mr. Cortez' replacement drive-by shooting car (i.e., the Altima with unique rims parked at his house on the night he was shot) into the Oxnard PD computer —this connection, too, would have tied Mr. Cortez to his current gang involvement for the defense and court and jury to

know—not just the prosecution team.

## CLAIM ONE

### 42 U.S.C. § 1983 – Deprivation of Due Process of Law and Violation of Right to a Fair Trial Under the Fourteenth Amendment

(Against Defendants City of Oxnard, Oxnard Police Department, Edward Baldwin, Alex Arnett, Chris Williams, John Crombach, and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

122.   Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

123.   Defendants, acting individually and in concert with each other—as well as under color of law and within the scope of their employment—accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendment.

124.   Defendants, acting individually and in concert with each other—as well as under color of law and within the scope of their employment—fabricated false evidence, suppress or destroyed exculpatory evidence and impeachment evidence from Plaintiff, his attorneys, prosecutors, investigators, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution, failed to investigate in a manner that shocks the conscience, and instead followed through with the unlawful prosecution of Mr. Ixta Jr., thereby violating Mr. Ixta Jr.'s right not to be deprived of liberty without due process of law.

125.   In addition, Defendants fabricated and solicited false evidence, including witness statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, obtained charges against Plaintiff, obtained his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

126.   The false evidence asserted herein is comprised of material omissions as well as affirmatively false and misleading statements in police reports, documents, and testimony prepared or given in connection with the investigation of the December 3, 2009 gang shooting.

127.   Defendants' misconduct, acting individually and/or in concert, further includes—but is not limited to—destroying, concealing, and/or suppressing exculpatory and potentially exculpatory evidence.

128.   Defendants' misconduct, acting individually and/or in concert, further includes—but is not limited to—reckless investigatory misconduct such as disregarding clear information incriminating more obvious suspects.

129.   Each Defendant knew or should have known the evidence was false, and the Defendants' conduct was intentional and knowing, or alternatively done with deliberate indifference to and/or reckless disregard for Plaintiff's rights or for the truth.

130.   The constitutional source against using false evidence is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein.  Plaintiff brings this claim as both a procedural and a substantive due process violation.  To the extent that any court were to conclude that the source of Plaintiff's right to not have false evidence used against him is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

131.   As a direct and proximate result of Defendants' actions, Mr. Ixta Jr. was wrongly arrested, detained, prosecuted, convicted, and incarcerated for more than 11 years and suffered other grievous injuries and damages set forth in this Complaint.  Absent this misconduct, Plaintiff's prosecution could not and would not have been pursued.

132.   The acts of the individual Defendants were willful, malicious,

intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

133.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled to an award of reasonable attorney's fees and costs according to proof.

134.   Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta's conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

## CLAIM TWO

### 42 U.S.C. § 1983 – Failure to Disclose Material Exculpatory Evidence (*Brady*, *Garcia*, And *Moody*)

(Against Defendants City of Oxnard, Oxnard Police Department, Edward Baldwin, Alex Arnett, Chris Williams, John Crombach, and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

135.   Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

136.    Defendants, while acting under color of law, deprived Plaintiff if his civil rights by violating his right to material exculpatory  evidence and information as required by *Brady v. Maryland*, 373 U.S. 83 (1963) Hereinafter *Brady* information); *People v. Garcia*, 17 Cal.App.4th 1169 (1992) (hereinafter *Garcia* information, and *Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) (hereinafter *Moody* information.)

137.   Pursuant to *Brady*, *Garcia*, and *Moody*, Defendants failed to disclose exculpatory evidence in the form of search warrants and other evidence to be established, to the prosecutors handling Mr. Ixta Jr.'s case and/or to turn over exculpatory evidence to Mr. Ixta Jr.'s defense attorneys, the conviction court, the sentencing court, the court of appeals or post-conviction court so that it could be used to prove Mr. Ixta Jr.'s innocence or secure his release from his wrongful

imprisonment, including exculpatory evidence that was actually known by all defendants, at the time of trial and sentencing.

138.   The actions of each Defendant, acting individually and/or in concert, in withholding evidence were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

139.   The constitutional source of the obligation to provide *Brady*, *Garcia*, and *Moody* information is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff's due process rights were violated by the conduct alleged herein.   Plaintiff brings this claim as both a procedural and a substantive due process violation.   To the extent that any court were to conclude that the source of Plaintiff's right to such exculpatory information is any constitutional source other than due process (such as the Fourth Amendment), this claim is brought on those bases as well.

140.   Defendants were each jointly and severally responsible to provide *Brady*, *Garcia*, and *Moody* information to the prosecutors handling Mr. Ixta Jr.'s case so that it could in turn be provided to Mr. Ixta Jr.'s defense team.   Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility do, and each ratified, approved or acquiesced in it.

141.   As a direct and proximate result of Defendants' conduct, Mr. Ixta Jr. was wrongly incarcerated for over 11 years and subjected to other grievous injuries and damages set forth in this Complaint.

142.   The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

143.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiff is entitled to an award of reasonable attorney's fees and costs according to proof.

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

144.   Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

## CLAIM THREE

**42 U.S.C. § 1983 – Deprivation of Due Process of Law re Impermissibly Suggestive Identification Procedures (*Simmons v. United States*, 390 U.S. 377 (1968))**

(Against Defendants Edward Baldwin and Alex Arnett by Plaintiff Ignacio Ixta, Jr.)

145.   Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

146.   Defendants, while acting under color of law, deprived Plaintiff of his civil rights as required by *Simmons v. United States*, 390 U.S. 377 (1968).)

147.   Pursuant to *Simmons v. United States*, Defendants engaged in impermissibly suggestive identification procedures.

148.   The identification resulting from the detectives' suggestive procedures lacked sufficient indicia or reliability as analyzed under the five factors outlined in *Neil v. Biggers*, 409 U.S. 188 (1972).

149.   The photographic identification techniques were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

150.   The actions of each Defendant, acting individually and/or in concert, were done with deliberate indifference to or reckless disregard for Plaintiff's rights or for the truth.

151.   The constitutional source of the obligation to abstain from employment impermissibly suggestive identification procedures is primarily the due process clause of the Fourteenth Amendment, and Plaintiff's due process rights were violated by the conduct alleged herein.  Plaintiff brings this claim as

both a procedural and a substantive due process violation.  To the extent that any court were to conclude that the source of Plaintiff's right is any constitutional source other than due process (such as the Fifth Amendment), this claim is brought on those bases as well.

152.   Defendants were each jointly and severally responsible to adhere to the law as set forth in *Simmons v. United States*, 390 U.S. 377 (1986).  Each engaged in, knew or should have known of the unconstitutional conduct alleged herein and failed to prevent it, which each had a responsibility do, and each ratified, approved or acquiesced in it.

153.   As a direct and proximate result of Defendants' conduct, Mr. Ixta Jr. was wrongly incarcerated for over 11 years and subjected to other grievous injuries and damages set forth in this Complaint.

154.   The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

155.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiff is entitled to an award of reasonable attorney's fees and costs according to proof.

156.   Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

///

///

///

## CLAIM FOUR

**42 U.S.C. § 1983 – Deprivation of Due Process of Law re Fabricated Evidence (*Devereaux v. Abbey,* 263 F.3d 1070 (9th Cir. 2001))**

(Against Defendants Edward Baldwin and Alex Arnett by Plaintiff Ignacio Ixta, Jr.)

157.   Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

158.   Defendants deliberately fabricated evidence and/or engaged in acts which deliberately caused the fabrication of evidence. For example, Detective Arnett fabricated evidence that HAK was not a gang (and Cortez was not a gang member)—which paved the way for Cortez and his girlfriend to corroborate the fabricated evidence. Detective Arnett fabricated evidence that Colonia Chiques rivals all other gangs/taggers in Oxnard.  Mr. Cortez' 100% certainty in identifying Ixta Jr. as the shooter was a consequence of Detective Arnett and Baldwin's suggestive identification procedures.  In fact, Detective Baldwin even told how to respond if asked about his initial non-dentification of Mr. Ixta Jr.

159.   The deliberate fabrications caused the plaintiff's deprivation of liberty.

160.   The Defendants acts were the cause in fact of the deprivation of Plaintiff's liberty—i.e., his injury would d not have occurred in the absence of Defendant's misconduct.

161.   The Defendants acts were the proximate cause of Plaintiff's injury—i.e., Plaintiff's injury was the type of injury a reasonable person would see as a likely result of the conduct in question.

162.   Defendants continued their investigation of Plaintiff despite the fact that they knew or should have known that he was innocent

163.   Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information.

164.   The defendants knowingly used coercive and abusive techniques that would likely generate false information

165. The defendants' investigations techniques demonstrated deliberate indifference to or reckless disregard for Plaintiffs rights not to be subjected to prosecution based upon false evidence.

166. As a direct and proximate result of Defendants' conduct, Mr. Ixta Jr. was wrongly incarcerated for over 11 years and subjected to other grievous injuries and damages set forth in this Complaint.

167. The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

168. By virtue of the provisions of 42 U.S.C. § 1988, Plaintiff is entitled to an award of reasonable attorney's fees and costs according to proof.

169. Because these claims necessarily imply the invalidity of Ignacio Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994)

## CLAIM FIVE

### 42 U.S.C. § 1983 – Illegal Detention and Prosecution

((Against Defendants City of Oxnard, Oxnard Police Department, Edward Baldwin, Alex Arnett, Chris Williams, John Crombach, and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

170. Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

171. Defendants, individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation

of his rights secured by the Fourth and Fourteenth Amendments.

172.   In so doing, Defendants caused Plaintiff to be deprived of his liberty and detained without probable cause and subjected improperly to judicial proceedings for which there was no probable cause.

173.   The misconduct described in this count was objectively unreasonable and was undertaken intentionally and with malice.

174.   As a result of the Defendants' misconduct described in this Claim, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages.

175.   The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

176.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled to an award of reasonable attorney's fees and costs according to proof.

177.   Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

///

///

///

///

///

## CLAIM SIX

**42 U.S.C. § 1983 – Monell Claims for Violations Arising from a Policy/Custom of Failing to Preserve and Disclose Exculpatory Evidence, Fabricating Evidence, Failing to Train and Supervise Regarding the Preservation and**

**Disclosure of Evidence in Homicide-Related Investigations Particularly in Gang-Related Cases**

(Against City of Oxnard, Oxnard Police Department, County of Ventura, Ventura County District Attorney's Office, and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

178.   Plaintiffs reallege each and every paragraph stated above in this complaint as if fully set forth here.

179.   Defendants County of Ventura and Oxnard Police Department routinely work together on criminal investigations, particularly serious felony investigations like an attempted murder, including the attempted murder of Mr. Cortez.  County of Ventura and Oxnard City employed the individual Defendants, supervised them, and promulgated policy, including written polices and unwritten customs, that caused the wrongful conviction of Mr. Ixta Jr., as described in this Complaint.

180.   At all times relevant to the events described in this Complaint (and for a time period before and after) County of Ventura, Ventura County District Attorney's Office, Oxnard City, and Oxnard Police Department failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: the conduct of interrogations and questioning criminal suspects and witnesses by officers and agents of Oxnard PD; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

181.   At all relevant times, Defendant County of Ventura had a custom and practice in the District Attorney's Office known as the Honey Badger approach. The Honey Badger approach was to "relentlessly pursue" the "goal" of being "the

person who has conducted the most jury trials." The practice called for prosecutors to "bite off" witness's heads and "spit [them] out at the feet of the defense attorney…for sport." The Honey Badger policy also called for prosecutors to not "give up or throw in the towel in the face of adverse testimony." "Win, lose, or draw," the "goal" was to "try as many cases as possible…"

(a)     At all relevant times, the Ventura County District Attorney's Office operated under a Honeybadger custom and practice. The infamous Honeybadger memo reflected the overall customs and practice within the DA's Office with regard to improper leveraging; threatening to go to trial on cases lacking probable cause; improper threatening to include gang enhancement; overzealous prosecutorial practices in violation of the California Rules of Professional Conduct and the United States Constitution under *Berger v. United States*, 295 U.S. 78 (1935).

(b)     The County of Ventura is sued as a governmental entity with ultimate responsibility for the non-prosecutorial functions and day to day administrative functions of hiring, firing, compensation, promotion, discipline and assignment of its employees.

(c)     Through its hiring, firing, compensation, promotion, job assignment and failure to discipline, the Ventura County District Attorney's Office at all times mentioned herein, including, but not limited to, the custom and practice of hiding, destroying and/or suppressing evidence, as well as creating false evidence during the investigatory phases of a criminal action, and suppressing evidence which would be exculpatory to a person accused of or suspected in a criminal action and/or proceeding.

(d)     The Ventura County District Attorney's Office employed Joanne Roth as a prosecutor and provided her with the power to inflict irreparable harm upon the citizens of this community despite its knowledge that she violated numerous ethical and criminal laws, that she acted maliciously and in her own self-

interest, and that she was the antithesis of what an honest DDA was supposed to be.

(e)     Joanne Roth was able to accomplish these acts of allegedly using her investigative team's "investigatory functions to, inter alia, influence investigation into the incent, alter investigative reports, hide evidence, destroy evidence, tamper with evidence and suborn perjury, threaten witnesses" in order to gain an attempted murder conviction against Ignacio Ixta Jr. because the Ventura County District Attorney's Office, and those individual defendants named herein, maintained an unwritten custom and practice of ignoring, condoning, and/or ratifying unethical conduct and behavior of its prosecutors.

(f)     The Ventura County District Attorney's Office also established and maintained policies and procedures for promoting and/or rewarding prosecutors who obtained convictions regardless of the unethical methods used in gaining the convictions or any wrongful conduct which violated the constitutional rights of the accused.

(g)     DDA Joanne Roth and Oxnard PD detectives used their investigative and administrative functions and used the administrative powers of the Ventura County District Attorney's office to execute a plan to keep exculpatory information evidence and documents from Mr. Ixta Jr's attorney.

(h)     Although the Ventura County District Attorney's Office and law enforcement officials had possession of and access to this exculpatory information well before the preliminary examination, and used those materials during their investigations, they used their investigative and administrative functions and powers to hide, secrete and otherwise prevent Mr. Ixta Jr's attorneys from getting access to the materials or using them in the criminal defense investigation and/or defense of the case.

(i)     The above conduct, in essence, prevented Mr. Ixta Jr.'s attorney from properly examining witnesses during the preliminary hearing or preparing the

case as quickly and fully as it should have been. Thus, the prosecution used its investigatory and administrative powers to deprive Mr. Ixta Jr. of his constitutional rights to a fair trial as set forth herein.

(j)     Because of the administrative policies permitting, condoning and fostering the above referenced conduct, DDA Joanne Roth and Oxnard PD detectives were free to and did conspire and acted so as to deprive Mr. Ixta's Jr.'s attorney of Mr. Cortez' search warrants.

(k)     All of the above acts were administrative functions which were being used by defendants, and each of them, in an attempt to violate Mr. Ixta's Jr.'s constitutional rights -- the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity.

(l)     The individual defendants pressured, coerced, extorted and/or otherwise improperly caused witnesses to give untruthful, erroneous, incomplete and/or misleading statements and testimony related to the underlying case.

(m)     The aforementioned conduct establishes violations of Mr. Ixta Jr's constitutional rights to the timely disclosure of exculpatory evidence, and of his constitutional right not to be prosecuted, or convicted or sentenced upon the testimony of witnesses who have been illegally coerced or influenced in their testimony, in violation of the Due Process Clause of the Fifth and Fourteenth Amendments, and the right to a fair trial under the Fifth, Sixth and Fourteenth Amendments.

182.   In addition (or alternatively), City of Oxnard, Oxnard Police Department, County of Ventura, and Ventura County District Attorney's Office failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of officers and agents of the Oxnard Police Department, and the Office of the District Attorney with respect to the conduct of interrogations and techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of

evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

183.   In addition, at all times relevant to the events described in this Complaint, Defendants had notice of practice and customs of officers and agents of the County of Ventura, Ventura County Office of the District Attorney,  and Oxnard Police Department that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutor and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated false evidence to implicate criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence, including physical evidence; and/or (5) officers pursued wrongful convictions through profoundly flawed investigations.

184.   Plaintiffs are informed and believe and thereon allege that, during all or portions of the period relevant to this case (2009 to 2021), Defendants County of Ventura, Ventura County District Attorney's Office, Oxnard City, Oxnard City Police Department, by and through the Ventura County District Attorney's Office, with deliberate indifference, and conscious and reckless disregard to the safety, security and constitutional and statutory rights of criminal suspects and defendants, including Plaintiff, had: (a) no established or clear administrative system in place; (b) no stated, written or adequate policies, and (c) no or inadequate training and supervisions regarding, inter alia, the following issues:

(a)     Ensuring that any police department or police officers with which the District Attorney's Office was working provided all exculpatory

evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, as numerous cases over the years made clear was its obligation.

(b)   Ensuring that any police department or police officers with which the District Attorney's Office was working provided its full investigative material and that material is actually reviewed by an appropriate deputy.

(c)   Ensuring that exculpatory evidence was not buried in files provided to the trial attorney handling the case by the police department or police officers with which the District Attorney's Office was working, and/or by members of its Office.

(d)   Ensuring that the police department or police officers with which the District Attorney's Office was working provided to the trial attorney prosecuting that case full and complete reports of any benefits (including but not limited to benefits in the form of monetary or other pecuniary benefits and leniency in other charges) provided to any witness, and/or that such information was disclosed to the defense.

(e)   Ensuring that any benefits or monies paid to or for the benefit of witnesses was both known to the relevant people in the District Attorney's Office, including the attorney assigned to try the case, and/or disclosed to the defense.  This includes benefits by the police provided in exchange for information provided by a witness or confidential informant.

(f)   Ensuring that false evidence was not being presented or relied upon by Deputy District Attorneys in prosecuting cases.

(g)   Ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions and called attention to any irregularities, deviations from policy or evidence favorable to the defense.

(h)   Ensuring that exculpatory evidence learned or discovered after

trial and conviction (including between trial and sentencing and after sentencing) was disclosed to defendants and their counsel.

(i)     Ensuring that exculpatory information known to Deputy District Attorneys would be identified, organized and maintained for production to the California Attorney General's Office for litigation in subsequent post-trial habeas and appellate proceedings.

(j)     Establishing procedures or systems to track or identify known false witness statements or other known facts that would make them unsuitable as witnesses in other cases or would be exculpatory evidence undermining their credibility if they were used as witnesses.

(k)     Ensuring that policies, procedures, systems, training and supervision were in place to ensure that the rights of convicted individuals existed and were properly implemented.

(l)     Failing to discipline personnel involved in dishonesty, particularly in enabling, encouraging, condoning or presenting false testimony that was known or should have been known to be false or that was utilized with a reckless disregard for, or deliberate indifference towards, the truth and the rights of the accused.

(m)     Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA before or after the preliminary hearing stage is provided to the defense.

(n)     Establishing procedures so all exculpatory/impeachment evidence discovered by law enforcement or the DA after a conviction is provided to the defense.

(o)     Ensuring that detectives do not improperly influence eyewitness identification through the use of suggestive identification procedures; or suggest answers or ways to excuse previous inconsistent statements.

(p)     Maintaining an adequate policy prohibiting suggestive

identification—e.g., eyewitness identifications should be free of suggestion, or prohibit directing witness's' attention to a particular photograph or pointing at a particular photograph; and/or not addressing the concept of suggestive identification at all.

(q)    Ensuring prosecutors do not use gang experts to fabricate false, prejudicial evidence at trial; experts disclosed in advance; experts write reports; experts base opinion on fact known to be true; experts review all material related to subject matter of opinions; not change experts to avoid a previously disclosed expert who it is determined has information not previously disclosed to the defense.

185.    Defendants had the habit, custom, pattern, and practiced, during all or parts of the relevant time period (2009 to the present) of:

(a)    Failing to identify or disclose exculpatory evidence or false evidence, particularly regarding Detective Baldwin and Arnett's and conduct to withhold exculpatory evidence and to falsify evidence, as previously alleged.

(b)    Entering into benefits agreements with key witnesses without disclosing them to the defense, and/or failing to identify and disclose such agreements.

(c)    Improperly influencing eyewitness identification by manipulation of witness or providing undisclosed benefits to them.

186.    The custom, policies, practices, failures, actions and inactions of the Defendants elaborated above were or should have been known to the policymakers responsible for the County of Ventura/Ventura County District Attorney's Office (and its then District Attorney, Greg Totten), and City of Oxnard/Oxnard Police Department (and its then Chief of Police, Chief John Crombach)—and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training,

1   supervision, or discipline in areas where the need for such things to occur was

2   obvious.   Given the long and recurring history elaborated above, the Ventura

3   District Attorney's Office and the Oxnard Police Department—and their respective

4   policy makers—were on notice of these deficiencies and failures.

5         187.   That the policies, practices, and customs of County of Ventura and the

6   City of Oxnard cause grave harm like that experienced by Mr. Ixta, Jr. is evidence

7   from the fact these policies, practices, and customs have caused the wrongful

8   convictions of other Californians, including, but not limited to: Craig Coley, who

9   was wrongly convicted in 1979 based on conduct and evidence that violated Mr.

10  Coley's constitutional rights.

11        188.   The customs, policies, practices, failures, actions and inactions of the

12  Ventura District Attorney's Office and Oxnard Police Department elaborated

13  above were so closely related to the deprivation of Mr. Ixta Jr.'s rights as to be a

14  moving force that caused the constitutional violations alleged herein.

15        189.   As a direct and proximate result of Defendant County and City of

16  Oxnard's acts and omissions, condoning, encouraging, ratifying and deliberate

17  ignoring the pattern and practice of district attorney's acts and omissions alleged

18  above, Mr. Ixta Jr. sustained injury and damage to be proved at trial.

19        190.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled

20  to an award of reasonable attorney's fees and costs according to proof.

21        191.   Because these claims necessarily imply the invalidity of Mr. Ixta's

22  attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was

23  vacated by the Ventura County Superior Court on April 12, 2021. *Heck v.*

24  *Humphrey*, 512 U.S. 477 (1994).

25                          **CLAIM SEVEN**

26              **42 U.S.C. § 1983 – Supervisory Liability**

27            (Against Defendants John Crombach and Does 5-7 by Plaintiff Ignacio

28

1    Ixta Jr.)

2    192.  Plaintiffs reallege each and every paragraph in this complaint as if

3    fully set forth here.

4    193.  Named defendants John Crombach and DOES 5-7,  failed to properly

5    train, assign, supervise, and guide their staff, to ensure that exculpatory evidence

6    like the search warrants referenced herein were provided during the investigation,

7    and prosecution of Ixta, Jr.

8    194.  On and after December 3, 2009, to April 12, 2021, defendants failed

9    to supervise their subordinates to ensure that investigation procedures concerning

10   coercion of witnesses did not occur and did not ensure that there were in place

11   systems to track or identify known false witness statements or other known facts

12   that would make witnesses unsuitable or would constitute exculpatory evidence

13   undermining credibility if they were used as witnesses. The named defendants

14   failed in ensuring that policies, procedures, systems, training and supervision were

15   in place to ensure that the rights of charged individuals were not violated.

16   Defendants Chief John Crombach and Does 5-7, while acting under color law,

17   failed to provide reasonable security, monitoring, training and supervision of its

18   employees, in particular of their investigators and criminologists in proper

19   investigative techniques and the constitutional requirements for such

20   investigations.

21   195.  Defendants Chief John Crombach and DOES 5-7, while acting under

22   color of law, knew, or in the exercise of reasonable care, should have known of a

23   history and propensity and pattern at the time of this incident for Defendant

24   Detective Edward Baldwin, Alex Arnett, and Chris Williams to engage in the

25   unconstitutional conduct enumerated above, including fabricating evidence,

26   withholding exculpatory evidence, manipulating witnesses and otherwise violating

27   the rights of criminal suspects of Defendants.  Defendants took no action to

28   prevent this unconstitutional conduct. Defendants Chief John Crombach and

DOES 5-7 knew or should have known of a high degree of risk that Defendants Edward Baldwin, Alex Arnett, and Chris Williams and others would conduct criminal investigations in a manner that violated the constitutional rights of citizens.

196.  Moreover, Chief John Crombach and Supervisors DOES 5-7, knew or should have known in this case that Defendants Detective Edward Baldwin, Alex Arnett, and Chris Williams and their fellow officers followed the practices described in this Complaint in the December 3, 2009-shooting- investigation, and coerced and intimidated witness, fabricated evidence, failed to document and disclose material exculpatory evidence, conducted a constitutionally inadequate investigation, and caused the arrest and prosecution of Mr. Ixta Jr. without probable cause.

197.  Defendants Chief John Crombach and DOES 5-7 knew, or in the exercise of reasonable care should have known, of a pattern or practice of unconstitutional violation, or the existence of facts which create the potential of unconstitutional acts, and these Defendants had a duty to train and instruct their subordinates to prevent similar acts but failed to take steps to properly train, supervise, investigate, or instruct their agents or employees.

198.  As a direct and proximate result of the conduct of Ventura County, Oxnard City, and Does 1-10, as described in this Complaint, Mr. Ixta Jr. suffered constitutional deprivations and grievous personal injuries and damages described in this Complaint.

199.  The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

200.  By virtue of the provisions of 42 U.S.C. § 1988, Plaintiff is entitled to an award of reasonable attorney's fees and costs according to proof.

201. Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

202. As a result of the lack of said accountability measures the constitutional rights of Ixta Jr. and, state and federal laws were violated.

203. Additionally, as policy making official(s) for Defendants County of Ventura, and City of Oxnard including John Crombach and DOES 5-7 are responsible for those municipal defendants' unconstitutional customs, policies, practices, and procedures, as well as their failures to properly hire, train, instruct, monitor, supervise, evaluate, investigate, manage, and discipline, as described above as well as their ratification of misconduct and constitutional violations as described above.

204. Said acts and omissions, customs and practices by defendants set in motion a series of acts by their subordinates that they knew or must have known would cause the subordinates to deprive the Plaintiffs of their rights as alleged above.

205. As a direct and proximate result of the actions, omissions, and practices of Defendants as described above, Plaintiffs sustained serious and permanent injuries and are entitled to damages, penalties, costs and attorney fees as set forth herein.

///

///

///

///

## **CLAIM EIGHT**

### **42 U.S.C. § 1983 – Loss of Familial Association in Violation of First and Fourteenth Amendments**

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1    (Against All Defendants and Does 1-10 by All Plaintiffs)

2    206.   Plaintiffs reallege each and every paragraph in this complaint as if

3    fully set forth here.

4    207.   Plaintiff P.I.I., is the minor child of Plaintiff Ignacio Ixta Jr.  At the

5    time that Plaintiff Ignacio Ixta Jr. was first detained, his girlfriend, Ginger

6    Martinez was three months pregnant with their child P.I.I.  At the time of P.I.I.'s

7    birth on 7/28/2010, Ignacio Ixta Jr. was deprived of the right to participate in his

8    son's birth, thus from birth, P.I.I. was deprived of the essential love, affection, the

9    bonding opportunity and his right of his father's love and affection and including

10   P.I.I.'s right to reciprocate in his father-son relationship rooted from birth through

11   a P.I.I.'s critical growing years. During his infancy and childhood, P.I.I. never

12   hugged, kissed or held his father's hand; he has no pictures of any activities with

13   his father; all his childhood P.I.I. was deprived of his father's trust, of his

14   encouragement and guidance; similarly of his right to the warmth and affection

15   exchanged between father and son; he was deprived of fatherly lessons stemming

16   from successes and hardships; defendants obstructed P.I.I.'s right to enjoyment of

17   growing up with the emotional and physical security rooted in having his father's

18   presence, affection and engagement in P.I.I.'s childhood's activities, successes and

19   learning experiences;   of participation in his school activities, extra-curricular

20   sports, holiday celebrations, family gatherings; P.I.I. was deprived of the friendship

21   and physical attention he observed other children received from their fathers, he

22   never held his father's hand growing up, never experienced his father helping him

23   learn a new life lesson or experience.

24   208.   Plaintiff A.I.., is the minor child of Plaintiff Ignacio Ixta Jr.  From an

25   early childhood, A.I. was deprived of the essential love, affection, the bonding

26   opportunity and his right of his father's love and affection and including A.I.'s

27   right to reciprocate in his father-son relationship rooted from birth through A.I.'s

28   critical growing years. During his childhood, A.I. never hugged, kissed or held his

father's hand; he has no pictures of any activities with his father; all his childhood A.I. was deprived of his father's trust, of his encouragement and guidance; similarly of his right to the warmth and affection exchanged between father and son; he was deprived of fatherly lessons stemming from successes and hardships; defendants obstructed A.I.'s right to enjoyment of growing up with the emotional and physical security rooted in having his father's presence, affection and engagement in A.I.'s childhood's activities, successes and learning experiences;  of participation in his school activities, extra-curricular sports, holiday celebrations, family gatherings; A.I. was deprived of the friendship and physical attention he observed other children received from their fathers, he never held his father's hand growing up, never experienced his father helping him learn a new life lesson or experience.

209.   A.I. was nearly fifteen years old at the time his father was released from custody.   The absence of his father from the routine and daily life activities of A.I. during his life created an incomprehensible void in his being that remains like an open deep wound requiring substantial and meaningful attention for his reparations and healing.

210.   P.I.I. was ten years nine months (10.9) old at the time his father was released from custody.   The absence of his father from the routine and daily life activities of P.I.I. during his life created an incomprehensible void in his being that remains like an open deep wound requiring substantial and meaningful attention for his reparations and healing.

211.   Defendants, through their misconduct against Mr. Ixta, recklessly or deliberately violated Mr. Ixta, Jr. and his sons, A.I.'s and P.I.I.'s First and Fourteenth Amendment rights to be free from unwarranted government interference with their familial relationship to Mr. Ixta Jr. without due process of law.

212.   These acts caused Mr. Ixta, Jr. and his sons to suffer the damages set

forth in this Complaint.

213.   The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

214.   By virtue of the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled to an award of reasonable attorney's fees and costs according to proof.

215.   Because these claims necessarily imply the invalidity of Mr. Ixta, Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura Superior Court on April 12, 2021. *Heck v. Humphrey*, 512 U.S. 477 (1994).

216.   Plaintiffs reallege each and every paragraph stated above in this complaint as if fully set forth here.

## **CLAIM NINE**
### **Violation of Bane Act – (Civ. Code § 52.1)**

(Against Defendants Edward Baldwin, Alex Arnett, and Chris Williams by Plaintiff Ignacio Ixta Jr.)

217.   Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

218.   Defendants interfered or attempted to interfere with Mr. Ixta Jr.'s rights secured by the United States and California constitution and laws, including through the use of threats, intimidation, or coercion.

219.   As a direct and proximate cause of Defendants recurring failure to come forward with exonerating evidence in their possession, Mr. Ixta Jr. suffered exposure to prison conditions and avoidable physical, mental, and pecuniary injuries, for which Defendants are liable.

220.   The acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and

exemplary damages in an amount to be determined at time of trial.

221. By virtue of the provisions of 42 U.S.C. § 1988, Plaintiffs are entitled to an award of reasonable attorney's fees and costs according to proof.

222. Because these claims necessarily imply the invalidity of Mr. Ixta's attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura County Superior Court on April 12, 2021. *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008).

## CLAIM TEN

### Negligence

(Against All Defendants and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

223. Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

224. Defendants had ongoing legal, constitutional, and statutory duties that obligated them to preserve, not destroy, and turn over evidence to Mr. Ixta Jr. Under California state law, in particular, Defendants violated California Government Code section 815.6. Under section 815.6, an entity has direct liability where it is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury and it fails to discharge that duty with reasonable diligence.

225. As a direct and proximate cause of Defendants recurring failure to come forward with exonerating evidence in their possession, Mr. Ixta Jr. suffered exposure to prison conditions and avoidable physical, mental, and pecuniary injuries, for which Defendants are liable. Absent such negligence/gross negligence, Mr. Ixta Jr. would have been able to establish both the violation of his rights and his innocence years earlier and would have been released from custody many years earlier than he was.

226. Plaintiffs allege that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and

conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial against individual Defendants.

227.   Because these claims necessarily imply the invalidity of Mr. Ixta Jr.'s attempted murder conviction, they were barred until Mr. Ixta Jr.'s conviction was vacated by the Ventura County Superior Court on April 12, 2021. *Yount v. City of Sacramento*, 43 Cal. 4th 885, 902 (2008).

**CLAIM ELEVEN**

**False Arrest/False Imprisonment**

(Against All Defendants and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

228.   Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

229.    Defendants arrested Mr. Ixta, Jr.

230.   The arrests actually harmed Mr. Ixta, Jr.

231.   Plaintiffs allege that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial against individual Defendants.

**CLAIM TWELVE**

**Intentional Infliction of Emotional Distress**

(Against Defendants Edward Baldwin, Alex Arnett, Chris Williams and Does 1-10 by Plaintiff Ignacio Ixta Jr.)

232.   Plaintiffs reallege each and every paragraph in this Complaint as if fully set forth here.

233.   Defendants' actions and conduct as set forth in this Complaint were extreme and outrageous.  Defendants' actions were rooted in an abuse of power or authority, and were undertaken with the intent to cause, or were in reckless

disregard for the probability that they would cause Plaintiffs severe emotional distress, as alleged in this Complaint.

234.   As an actual and proximate result of the Defendants' actions, Plaintiffs suffered and continues to suffer severe emotional distress.

235.   Plaintiffs allege that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiffs' rights, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial against individual Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

**Claim One: 42 U.S.C. § 1983 – Deprivation of Due Process of Law and Violation of Right to a Fair Trial Under the Fourteenth Amendment**

(a) For general damages according to proof;

(b) For special damages according to proof;

(c) For interest on all sums as allowed by law;

(d) For punitive against individual defendants in an amount to be determined at trial;

(e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S. C. Section 1988;

(f) For an award against Defendants an in favor of Plaintiffs of all costs incurred herein by Plaintiffs; and

(g) For such other and further relief as the Court deems just and proper.

**Claim Two: 42 U.S.C. § 1983 – Failure to Disclose Material Exculpatory Evidence (Brady, Garcia, And Moody)**

(a) For general damages according to proof;

(b) For special damages according to proof;

(c) For interest on all sums as allowed by law;

(d) For punitive against individual defendants in an amount to be determined at trial;

(e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S. C. Section 1988;

(f) For an award against Defendants an in favor of Plaintiffs of all costs incurred herein by Plaintiffs; and

(g) For such other and further relief as the Court deems just and proper.

**Claim Three: 42 U.S.C. § 1983 – Deprivation of Due Process of Law re Impermissibly Suggestive Identification Procedures (Simmons v. United States, 390 U.S. 377 (1968))**

(a) For general damages according to proof;

(b) For special damages according to proof;

(c) For interest on all sums as allowed by law;

(d) For punitive against individual defendants in an amount to be determined at trial;

(e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S. C. Section 1988;

(f) For an award against Defendants an in favor of Plaintiffs of all costs incurred herein by Plaintiffs; and

(g) For such other and further relief as the Court deems just and proper.

**Claim Four: 42 U.S.C. § 1983 – Deprivation of Due Process of Law re Fabricated Evidence   (Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001))**

(a) For general damages according to proof;

1       (b) For special damages according to proof;

2       (c) For interest on all sums as allowed by law;

3       (d) For punitive against individual defendants in an amount to be determined

4          at trial;

5       (e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S. C.

6          Section 1988;

7       (f) For an award against Defendants an in favor of Plaintiffs of all costs

8          incurred herein by Plaintiffs; and

9       (g) For such other and further relief as the Court deems just and proper.

10 **Claim Five: 42 U.S.C. § 1983 – Illegal Detention and Prosecution**

11      (a) For general damages according to proof;

12      (b) For special damages according to proof;

13      (c) For interest on all sums as allowed by law;

14      (d) For punitive against individual defendants in an amount to be determined

15         at trial;

16      (e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C.

17         Section 1988;

18      (f) For an award against Defendants an in favor of Plaintiffs of all costs

19         incurred herein by Plaintiffs; and

20      (g) For such other and further relief as the Court deems just and proper.

21 **Claim Six: 42 U.S.C. § 1983 – Monell Claims**

22      (a) For general damages according to proof;

23      (b) For special damages according to proof;

24      (c) For interest on all sums as allowed by law;

25      (d) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C.

26         Section 1988;

27      (e) For an award against Defendants an in favor of Plaintiffs of all costs

28         incurred herein by Plaintiffs; and

1    (f) For such other and further relief as the Court deems just and proper.

2    **Claim Seven: 42 U.S.C. § 1983 – Supervisory Liability**

3        (a) For general damages according to proof;

4        (b) For special damages according to proof;

5        (c) For interest on all sums as allowed by law;

6        (d) For punitive against individual defendants in an amount to be determined

7            at trial;

8        (e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C.

9            Section 1988;

10       (f) For an award against Defendants an in favor of Plaintiffs of all costs

11           incurred herein by Plaintiffs; and

12       (g) For such other and further relief as the Court deems just and proper.

13   **Claim Eight: Loss of Familial Association in Violation of First and Fourteenth**

14                        **Amendments**

15       (a) For general damages according to proof;

16       (b) For special damages according to proof;

17       (c) For interest on all sums as allowed by law;

18       (d) For punitive against individual defendants in an amount to be determined

19           at trial;

20       (e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C.

21           Section 1988 and Section 1021.5 of the Code of Civil Procedure;

22       (f) For an award against Defendants an in favor of Plaintiffs of all costs

23           incurred herein by Plaintiffs; and

24       (g) For such other and further relief as the Court deems just and proper.

25   **Claim Nine: Violation of Bane Act – (Cal. Civ. Code § 52.1)**

26       (a) For general damages according to proof;

27       (b) For special damages according to proof;

28       (c) For interest on all sums as allowed by law;

1    (d) For punitive against individual defendants in an amount to be determined

2        at trial;

3    (e) For attorney's fees incurred by the Plaintiffs pursuant to 42 U.S.C.

4        Section 1988 and Section 1021.5 of the Code of Civil Procedure;

5    (f) For an award against Defendants an in favor of Plaintiffs of all costs

6        incurred herein by Plaintiffs; and

7    (g) For such other and further relief as the Court deems just and proper.

8    **Claim Ten: Negligence**

9    (a) For general damages according to proof;

10    (b) For special damages according to proof;

11    (c) For interest on all sums as allowed by law;

12    (d) For such other and further relief as the Court deems just and proper.

13    **Claim Eleven: False Arrest/False Imprisonment**

14    (a) For general damages according to proof;

15    (b) For special damages according to proof;

16    (c) For interest on all sums as allowed by law;

17    (d) For punitive against individual defendants in an amount to be determined

18        at trial;

19    (e) For attorney's fees incurred by the Plaintiffs pursuant to Section 1021.5

20        of the Code of Civil Procedure;

21    (f) For an award against Defendants an in favor of Plaintiffs of all costs

22        incurred herein by Plaintiffs; and

23    (g) For such other and further relief as the Court deems just and proper.

24    **Claim Twelve: Intentional Infliction of Emotional Distress**

25    (a) For general damages according to proof;

26    (b) For special damages according to proof;

27    (c) For interest on all sums as allowed by law;

28    (d) For punitive against individual defendants in an amount to be determined

**COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

at trial;

(e) For an award against Defendants an in favor of Plaintiffs of all costs incurred herein by Plaintiffs; and

(f) For such other and further relief as the Court deems just and proper.

Dated: April 12, 2022           Respectfully submitted,

**PACHOWICZ | GOLDENRING APLC**

/s/ Mark Pachowicz
Mark Pachowicz
Jennie Hendricson
Attorneys for Plaintiff Ignacio Ixta, Jr.

Dated: April 12, 2022           **SONIA MERCADO AND ASSOCIATES**

/s/ Sonia Mercado
Sonia Mercado
Attorney for Plaintiff P.I.I., a minor, by and through his guardian ad litem, Ginger Martinez

Dated: April 12, 2022           **LAW OFFICES OF JONNY RUSSELL**

/s/ Jonny Russell
Jonny Russell
Attorney for Plaintiff A.I., a minor, by and through his guardian ad litem, Wendy Galvan

## DEMAND FOR JURY TRIAL

All Plaintiffs hereby demand a trial by jury.

Dated: April 12, 2022           Respectfully submitted,

**PACHOWICZ | GOLDENRING APLC**

/s/ Mark Pachowicz
Mark Pachowicz
Jennie Hendricson
Attorneys for Plaintiff Ignacio Ixta, Jr.

1

2  Dated: April 12, 2022                **SONIA MERCADO AND ASSOCIATES**

3
                                        /s/ Sonia Mercado
4                                       Sonia Mercado
                                        Attorney for Plaintiff P.I.I., a minor, by and
5                                       through his guardian ad litem, Ginger Martinez

6  Dated: April 12, 2022                **LAW OFFICES OF JONNY RUSSELL**

7
                                        /s/ Jonny Russell
8                                       Jonny Russell
                                        Attorney for Plaintiff A.I., a minor, by and
9                                       through his guardian ad litem, Wendy Galvan

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28